## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JASMON STALLINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **10 C 6987** |
| | ) | |
| LIPING ZHANG, | ) | Judge James F. Holderman |
| PARTHASARATHI GHOSH, | ) | |
| IMHOTEP CARTER, | ) | Magistrate Judge Maria Valdez |
| RONALD SCHAEFER, | ) | |
| LA TANYA WILLIAMS, | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | |
| and the ILLINOIS DEPARTMENT OF | ) | |
| CORRECTIONS | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S
## FIRST AMENDED COMPLAINT

Plaintiff JASMON STALLINGS, by his Court-appointed attorney, for his *First Amended Complaint*, alleges as follows:

### NATURE OF THE ACTION

1.       Plaintiff Jasmon Stallings brings this action pursuant to 42 U.S.C. § 1983 to redress continuing violations of his rights under the Eighth and Fourteenth Amendments to the U.S. Constitution to be free from cruel and unusual punishment while he is incarcerated in Illinois Department of Corrections facilities.   Specifically, Mr. Stallings has been continually denied adequate medical care and treatment of his serious medical needs as a consequence of Defendants' deliberate indifference to his medical needs.  Mr. Stallings seeks

injunctive and declaratory relief, as well as actual, consequential, and punitive damages, attorneys' fees, and court costs from Defendants.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because it is a civil action arising under the U.S. Constitution seeking to obtain relief for injury resulting from the deprivation of rights under 42 U.S.C. § 1983.

3. All of the events complained of in this *First Amended Complaint* occurred during Mr. Stallings's incarceration in the Northern District of Illinois. Venue is therefore proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b).

## PARTIES

4. Mr. Stallings is an inmate in the Illinois Department of Corrections ("IDOC") and is currently incarcerated at Stateville Correctional Center ("Stateville") in Crest Hill, Illinois. He was first incarcerated at Stateville in or around April 2007, where he remains to this day. Mr. Stallings's inmate identification number is B-83576. While in the custody of the IDOC, Mr. Stallings has no ability to choose a health care provider or otherwise exercise any meaningful decisions or control over his medical care.

5. Upon information and belief, Wexford Health Sources, Inc. ("Wexford") is a Florida corporation that has contracted with the IDOC to provide health care and medical services to inmates. Upon information and belief, Wexford is, and at all times relevant to this lawsuit was, engaged in the business of providing health care professionals and health care and medical services to correctional facilities in Illinois, including Stateville.

2

6.     Defendant Parthasarathi Ghosh has at all relevant times been a physician licensed to practice in the state of Illinois.  (Upon information and belief, Dr. Ghosh's medical license expired in July 2011 and was not renewed.)  Upon information and belief, at all relevant times (until May 2011) Dr. Ghosh was employed by Wexford as the Medical Director of Stateville's Health Care Unit.  Upon information and belief, Dr. Ghosh had management and administrative responsibilities while at Stateville, including responsibility for Stallings's medical treatment and care.  Mr. Stallings sues Dr. Ghosh in his individual capacity and official capacity.

7.     Defendant Imhotep Carter has at all relevant times been a physician licensed to practice in the state of Illinois.  Upon information and belief, at all relevant times (since May 2011) Dr. Carter has been employed by Wexford as the Medical Director of Stateville's Health Care Unit.  Upon information and belief, Dr. Carter has management and administrative responsibilities at Stateville, including responsibility for Stallings's medical treatment and care.  Mr. Stallings sues Dr. Carter in his individual capacity and official capacity.

8.     Defendant Liping Zhang has at all relevant times been a physician licensed to practice in the state of Illinois.  Upon information and belief, at all relevant times (until February 2011) Dr. Zhang was employed by Wexford as a staff doctor at Stateville's Health Care Unit and as such was responsible for examining and treating inmates, including Mr. Stallings.  Mr. Stallings sues Dr. Zhang in her individual capacity.

9.     Defendant Ronald Schaefer has at all relevant times been a physician licensed to practice in the state of Illinois.  Upon information and belief, at all relevant times (until October 2011) Dr. Schaefer was employed by Wexford as a staff doctor at Stateville's Health

Care Unit and as such was responsible for examining and treating inmates, including Mr. Stallings. Mr. Stallings sues Dr. Schaefer in his individual capacity.

10. Defendant La Tanya Williams has at all relevant times been a physician assistant licensed to practice in the state of Illinois. Upon information and belief, at all relevant times Ms. Williams has been employed by Wexford as a physician assistant at Stateville's Health Care Unit and as such was responsible for providing health care and medical services to inmates at Stateville, including Mr. Stallings. Mr. Stallings sues Ms. Williams in her individual capacity.

**GENERAL ALLEGATIONS**

11. While previously incarcerated at Menard Correctional Center, Mr. Stallings began suffering from a nodule or 'bump' on the back of his scalp, which Menard medical staff described in 2004 as being a keloid. A keloid is an expanding overgrowth of scar tissue; keloid lesions can cause physical disfigurement, significant pain, and (depending on their location) limited movement and mobility.

12. Mr. Stallings was transferred to Stateville in or around April 2007.

13. While at Stateville, over time the condition on the back of Mr. Stallings's scalp grew in number and size, eventually merging into one large, bumpy mass on the back of his scalp that is many times the area of the original condition, and which rises substantially above the surface of his scalp.

14. Mr. Stallings's affliction prevents hair growth in the affected area on the back of his scalp, is physically disfiguring and, without treatment, continues to grow larger over time and to cause additional disfigurement. For example, on various occasions, Stateville

prison officials – including but not limited to Assistant Warden Reed in 2008 and Warden Hardy in December 2011 – have expressed alarm over Stalling's medical condition and expressed concern that medical treatment should be provided.

15.     Mr. Stallings's affliction very frequently becomes infected, resulting in draining puss and bleeding, typically on a weekly basis.  For example, in 2008, Stateville's barbers refused to cut Mr. Stallings's hair without a written letter from the Health Care Unit stating that the afflicted area was not dangerous or contagious.  As other examples, Mr. Stallings's cellmates at Stateville (i.e., six different individuals) have witnessed and expressed alarm over the growth, puss and bleeding and expressed concern that medical treatment should be provided.

16.     Mr. Stallings's affliction is highly sensitive and painful when touched or when pressure is applied.  For example when lying down to sleep, pressure to the area causes pain to Mr. Stallings that results in sporadic sleep and subsequent fatigue, all of which interfere with Mr. Stallings's daily activities.

17.     Mr. Stallings's affliction is associated with severe headaches, typically daily, as well as dizziness and (beginning in 2010) occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.  At times when Mr. Stallings fainted in early 2010, no medical staff responded in any way.

18.     During his tenure at Stateville and through the present date, Mr. Stallings has requested medical treatment for his above-described medical conditions from Stateville medical staff.

19.     During his tenure at Stateville and through the present date, Mr. Stallings has repeatedly on many occasions (and whenever seeing any Stateville physician, physician

assistant, or nurse) requested that the Stateville medical staff provide appropriate treatment for the growing affliction, disfigurement, recurring infections, pain, loss of sleep, headaches, dizziness, and occasional fainting (as described above). Such requests were made, for example, directly to Drs. Ghosh, Zhang, and Schaeffer, and to Ms. Williams.

20. The medical staff at Stateville (including Ghosh, Zhang, Schaeffer, and Williams) have never conducted more than a cursory examination of the growth on the back of Mr. Stalling's scalp, only feeling the back of his head.

21. The medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to order any skin biopsy or other test (other than one staff-ordered tuberculosis test) to rule out other skin growths, tumors and malignancies. Similarly, the medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to determine or address the cause of the recurring infections, draining puss and bleeding. Further, keloids (which contain only scar tissue) do not normally pus, seep or bleed, so it is highly questionable whether the growth even is a keloid.

22. The medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to provide any treatment for his pain and loss of sleep.

23. Despite having notice of Stallings's headaches, dizziness, and occasional fainting, the medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to determine any cause or treatment for those aspects of his medical condition.

24. The medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to order any tests (other than a single staff-ordered x-ray) to diagnose or treat his headaches, dizziness and occasional fainting.

25.     The medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have refused to refer Stallings for examination by a dermatologist, neurologist, or other appropriate specialists, despite his worsening condition.  Mr. Stallings is also aware of at least three other inmates having received treatment for similar skin conditions (i.e., successful removal or remedying of the condition).

26.     Although Dr. Zhang occasionally prescribed creams, antibiotics and shampoos for Mr. Stallings's periodic infections, and staff occasionally provided aspirin-type pain relievers, the medical staff at Stateville (including Ghosh, Zhang, Schaefer and Williams) have advised Mr. Stallings that there was 'nothing more they could do about his condition'. On another occasion Dr. Schaefer said that Mr. Stallings's scalp affliction was "nothing." Upon information and belief, those opinions were based on cost concerns and related indifference to Mr. Stallings' condition, and not medically accepted standards of adequate treatment.  For example, Ms. Williams stated to Mr. Stallings that medical care could not be provided because "Stateville is broke" and that "money is not available."

27.     The prescribed creams, antibiotics and shampoos provided to Mr. Stallings have in no way improved or provided other relief to his medical conditions, and in fact have resulted in distressing side effects.   For example, the prescribed shampoo resulted in substantial hair loss.  Mr. Stallings has complained of the ineffectual treatments and side effects to the medical staff at Stateville (including Ghosh, Zhang, Schaeffer, and Williams), without result.

28.     The medical staff at Stateville (including Ghosh, Zhang, Schaeffer, and Williams) have refused to provide any common, medically accepted treatment for his above-described medical conditions.

29.    Although Mr. Stallings periodically submits 'medical slips' requesting medical appointments and treatment, the medical staff at Stateville (including Ghosh, Carter, Zhang, Schaeffer, and Williams) have begun refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.  Medical slips that were submitted by Mr. Stallings, but which elicited no response, are attached as *Group Exhibit A*.

30.    Mr. Stallings has been visibly suffering for years, and lives every day in fear that without proper care, his condition will worsen, resulting in increased physical deformity, continued pain and suffering, and potentially become a permanent medical condition.  These fears have left him depressed and ashamed, and demonstrate that Mr. Stallings is not being treated with the minimum level of respect that the U.S. Constitution acknowledges is due to all citizens.

31.    From 2007 to the present, Defendants have known that their unreasonable delay in treating Mr. Stallings has resulted in his worsening condition, increased physical deformity, and continued and exacerbated pain and suffering.

## ADMINISTRATIVE PROCEDURES

32.    Mr. Stallings filed a "Committed Person's Grievance" on May 17, 2008, regarding the growth on the back of his scalp and related infections.  A copy of that grievance is attached as *Exhibit B*.  Upon information and belief, the grievance was never answered.

33.    Mr. Stallings filed a "Committed Person's Grievance" on November 23, 2008, regarding the growth on the back of his scalp and related pain, infections, and bleeding.  A

copy of that grievance is attached as *Exhibit C*. Upon information and belief, the grievance was never answered.

34. Mr. Stallings filed a "Committed Person's Grievance" on January 25, 2009, regarding the growth on the back of his scalp and related bleeding. A copy of that grievance is attached as *Exhibit D*. The Illinois Department of Corrections refused to consider the grievance and returned it in a memorandum dated February 2, 2009. A copy of that memorandum is attached as *Exhibit E*.

35. Mr. Stallings filed an "Offender's Grievance" in March 2009, regarding prior unanswered grievances and the need for proper treatment for his condition. A copy of that grievance is attached as *Exhibit F*. The Illinois Department of Corrections refused to consider the grievance and returned it in a memorandum dated March 23, 2009. A copy of that memorandum is attached as *Exhibit G*.

36. Mr. Stallings filed an "Offender's Grievance" on January 7, 2010, regarding the growth on the back of his scalp, related headaches, and fainting, and the failure of medical personnel to respond to his fainting. A copy of that grievance is attached as *Exhibit H*. Upon information and belief, the grievance was ultimately denied by the Illinois Department of Corrections in a letter dated September 8, 2010. A copy of that denial on final appeal is attached as *Exhibit I*.

37. Mr. Stallings filed an "Offender's Grievance" on January 8, 2010, regarding the the growth on the back of his scalp, related infections and fainting. A copy of that grievance is attached as *Exhibit J*. Upon information and belief, the grievance was ultimately denied by the Illinois Department of Corrections in a letter dated September 8, 2010. A copy of that denial on final appeal is attached as *Exhibit I*.

38.     Mr. Stallings filed an "Offender's Grievance" on May 11, 2011, regarding the growth on the back of his scalp and related infections, bleeding and headaches.  A copy of that grievance is attached as *Exhibit K*.  Upon information and belief, the grievance was ultimately denied (without actual treatment) by the Illinois Department of Corrections in a memorandum dated October 26, 2011.  A copy of that denial on final appeal is attached as *Exhibit L*.

39.     Mr. Stallings has exhausted all available administrative remedies available to him by repeatedly initiating formal grievance procedures in efforts to obtain proper medical treatment.  Such grievances have been either ignored or improperly denied, and meaningful diagnosis and treatment has continued to be denied.

### Count I
### (*Violation of § 1983 against Dr. Ghosh*)

40.     Mr. Stallings repeats and realleges paragraphs 1 – 39.

41.     As Stateville's Medical Director, Dr. Ghosh acted under color of state law.

42.     While Mr. Stallings has been in the custody of the IDOC at Stateville, and restrained from providing himself with medical care, Dr. Ghosh deliberately delayed and/or denied medical care to alleviate Mr. Stallings's known and obvious serious medical conditions.

43.     Dr. Ghosh's deliberate indifference to Mr. Stallings's known and obvious serious medical needs is evidenced by Dr. Ghosh's:

a.     Deliberately refusing to perform more than a cursory examination of the growth on the back of Stalling's scalp;

       b.      Deliberately refusing to order any skin biopsy or other test (other than one staff-ordered tuberculosis test) to rule out other skin growths, tumors and malignancies, or to determine or address the cause of the infections, draining puss and bleeding;

       c.      Deliberately refusing to provide any treatment for his pain and loss of sleep;

       d.      Deliberately refusing to determine any cause or treatment for Stallings's headaches, dizziness, and occasional fainting.

       e.      Deliberately refusing to refer Mr. Stallings for examination by a dermatologist, neurologist, or other appropriate specialists, despite his worsening condition.

       f.      Deliberately refusing to provide Mr. Stallings with medically accepted standards of adequate treatment.

       g.      Deliberately refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.

44.    The deliberate indifference exhibited by Dr. Ghosh caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury to his scalp, as evidenced by the continued growth of Mr. Stallings's scalp affliction and his increased physical disfigurement.

45.    The deliberate indifference exhibited by Dr. Ghosh caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by continued infections, resulting in draining puss and bleeding, typically on a weekly basis.

46.    The deliberate indifference exhibited by Dr. Ghosh caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by

sensitivity and continued pain causing sporadic sleep and resulting fatigue to Mr. Stallings, all of which interfere with Stallings's daily activities.

47.     The deliberate indifference exhibited by Dr. Ghosh caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by his almost daily, severe headaches, as well as dizziness and occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.

48.     Dr. Ghosh's treatment decisions, and lack thereof, were a substantial departure and abandonment of accepted professional judgment, practice, and standards.

49.     To this day, Mr. Stallings still has not received the medical care that he needs.

## Count II
### (*Violation of § 1983 against Dr. Carter*)

50.     Mr. Stallings repeats and realleges paragraphs 1 – 39.

51.     As Stateville's Medical Director, Dr. Carter acted under color of state law.

52.     Upon information and belief, as Stateville's new Medical Director, Dr. Carter has become familiar with Mr. Stalling's condition and need for medical treatment, and Dr. Carter is a gatekeeper who is ultimately responsible for referring inmates to medical specialists and outside treatment such as surgeries and other hospital treatments.

53.     While Mr. Stallings has been in the custody of the IDOC at Stateville, and restrained from providing himself with medical care, Dr. Carter has deliberately delayed and/or denied medical care to alleviate his known and obvious serious medical conditions.

54.     Dr. Carter's deliberate indifference to Mr. Stallings's known and obvious serious medical needs is evidenced by Dr. Carter's:

a.   Deliberately refusing to order any skin biopsy or other test (other than one staff-ordered tuberculosis test) to rule out other skin growths, tumors and malignancies, or to determine or address the cause of the infections, draining puss and bleeding;

b.   Deliberately refusing to provide any treatment for his pain and loss of sleep;

c.   Deliberately refusing to determine any cause or treatment for Stallings's headaches, dizziness, and occasional fainting.

d.   Deliberately refusing to refer Mr. Stallings for examination by a dermatologist, neurologist, or other appropriate specialists, despite his worsening condition.

e.   Deliberately refusing to provide Mr. Stallings with medically accepted standards of adequate treatment.

f.   Deliberately refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.

55.   The deliberate indifference exhibited by Dr. Carter caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury to his scalp, as evidenced by the continued growth of Mr. Stallings's scalp affliction and his increased physical disfigurement.

56.   The deliberate indifference exhibited by Dr. Carter caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by continued infections, resulting in draining puss and bleeding, typically on a weekly basis.

57.   The deliberate indifference exhibited by Dr. Carter caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by

sensitivity and continued pain causing sporadic sleep and resulting fatigue to Mr. Stallings, all of which interfere with Stallings's daily activities.

58.     The deliberate indifference exhibited by Dr. Carter caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by his almost daily, severe headaches, as well as dizziness and occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.

59.     Dr. Carter's treatment decisions, and lack thereof, were a substantial departure and abandonment of accepted professional judgment, practice, and standards.

60.     To this day, Mr. Stallings still has not received the medical care that he needs.

## Count III
### (Violation of § 1983 against Dr. Zhang)

61.     Mr. Stallings repeats and realleges paragraphs 1 – 39.

62.     As a Stateville staff doctor, Dr. Zhang acted under color of state law.

63.     While Mr. Stallings has been in the custody of the IDOC at Stateville, and restrained from providing himself with medical care, Dr. Zhang has deliberately delayed and/or denied medical care to alleviate his known and obvious serious medical conditions.

64.     Dr. Zhang's deliberate indifference to Mr. Stallings's known and obvious serious medical needs is evidenced by Dr. Zhang's:

a.      Deliberately refusing to perform more than a cursory examination of the growth on the back of Stalling's scalp;

b.      Deliberately refusing to order any skin biopsy or other test (other than one staff-ordered tuberculosis test) to rule out other skin growths, tumors and malignancies, or to determine or address the cause of the infections, draining puss and bleeding;

c.      Deliberately refusing to provide any treatment for his pain and loss of sleep;

d.      Deliberately refusing to determine any cause or treatment for Stallings's headaches, dizziness, and occasional fainting.

e.      Deliberately refusing to refer Mr. Stallings for examination by a dermatologist, neurologist, or other appropriate specialists, despite his worsening condition.

f.      Deliberately refusing to provide Mr. Stallings with medically accepted standards of adequate treatment.

g.      Deliberately refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.

65.     The deliberate indifference exhibited by Dr. Zhang caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury to his scalp, as evidenced by the continued growth of Mr. Stallings's scalp affliction and his increased physical disfigurement.

66.     The deliberate indifference exhibited by Dr. Zhang caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by continued infections, resulting in draining puss and bleeding, typically on a weekly basis.

67.     The deliberate indifference exhibited by Dr. Zhang caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by sensitivity and continued pain causing sporadic sleep and resulting fatigue to Mr. Stallings, all of which interfere with Stallings's daily activities.

68.     The deliberate indifference exhibited by Dr. Zhang caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by his

almost daily, severe headaches, as well as dizziness and occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.

69.     Dr. Zhang's treatment decisions, and lack thereof, were a substantial departure and abandonment of accepted professional judgment, practice, and standards.

70.     To this day, Mr. Stallings still has not received the medical care that he needs.

## Count IV
### (*Violation of § 1983 against Dr. Schaefer*)

71.     Mr. Stallings repeats and realleges paragraphs 1 – 39.

72.     As a Stateville staff doctor, Dr. Schaefer acted under color of state law.

73.     While Mr. Stallings has been in the custody of the IDOC at Stateville, and restrained from providing himself with medical care, Dr. Schaefer has deliberately delayed and/or denied medical care to alleviate his known and obvious serious medical conditions. For example, on one occasion Dr. Schaefer said that Mr. Stallings's scalp affliction was "nothing."

74.     Dr. Schaefer's deliberate indifference to Mr. Stallings's known and obvious serious medical needs is evidenced by Dr. Schaefer's:

        a.      Deliberately refusing to perform more than a cursory examination of the growth on the back of Stalling's scalp;

        b.      Deliberately refusing to order any skin biopsy or other test (other than one staff-ordered tuberculosis test) to rule out other skin growths, tumors and malignancies, or to determine or address the cause of the infections, draining puss and bleeding;

        c.      Deliberately refusing to provide any treatment for his pain and loss of sleep;

       d.      Deliberately refusing to determine any cause or treatment for Stallings's headaches, dizziness, and occasional fainting.

       e.      Deliberately refusing to refer Mr. Stallings for examination by a dermatologist, neurologist, or other appropriate specialists, despite his worsening condition.

       f.      Deliberately refusing to provide Mr. Stallings with medically accepted standards of adequate treatment.

       g.      Deliberately refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.

75.     The deliberate indifference exhibited by Dr. Schaefer caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury to his scalp, as evidenced by the continued growth of Mr. Stallings's scalp affliction and his increased physical disfigurement.

76.     The deliberate indifference exhibited by Dr. Schaefer caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by continued infections, resulting in draining puss and bleeding, typically on a weekly basis.

77.     The deliberate indifference exhibited by Dr. Schaefer caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by sensitivity and continued pain causing sporadic sleep and resulting fatigue to Mr. Stallings, all of which interfere with Stallings's daily activities.

78.     The deliberate indifference exhibited by Dr. Schaefer caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by his almost daily, severe headaches, as well as dizziness and occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.

79.     Dr. Schaefer's treatment decisions, and lack thereof, were a substantial departure and abandonment of accepted professional judgment, practice, and standards.

80.     To this day, Mr. Stallings still has not received the medical care that he needs.

### Count V
### (*Violation of § 1983 against Ms. Williams*)

81.     Mr. Stallings repeats and realleges paragraphs 1 – 39.

82.     As a Stateville staff physician's assistant, Ms. Williams acted under color of state law.

83.     While Mr. Stallings has been in the custody of the IDOC at Stateville, and restrained from providing himself with medical care, Ms. Williams has deliberately delayed and/or denied medical care to alleviate his known and obvious serious medical conditions.

84.     Ms. Williams's deliberate indifference to Mr. Stallings's known and obvious serious medical needs is evidenced by Ms. Williams's:

    a.      Deliberately refusing to perform more than a cursory examination of the growth on the back of Stalling's scalp;

    b.      Deliberately refusing to provide any treatment for his pain and loss of sleep;

    c.      Deliberately refusing to provide Mr. Stallings with medically accepted standards of adequate treatment.

    d.      Deliberately refusing to see or examine Mr. Stallings for matters related to his above-described medical conditions.

    e.      Deliberately denying him meaningful access to physicians.

85.     The deliberate indifference exhibited by Ms. Williams caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury to his scalp, as evidenced by the continued growth of Mr. Stallings's scalp affliction and his increased physical disfigurement.

86.     The deliberate indifference exhibited by Ms. Williams caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by continued infections, resulting in draining puss and bleeding, typically on a weekly basis.

87.     The deliberate indifference exhibited by Ms. Williams caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by sensitivity and continued pain causing sporadic sleep and resulting fatigue to Mr. Stallings, all of which interfere with Stallings's daily activities.

88.     The deliberate indifference exhibited by Ms. Williams caused Mr. Stallings unnecessary and wanton infliction of pain and further significant injury, as evidenced by his almost daily, severe headaches, as well as dizziness and occasional fainting, all of which interfere with his daily activities and which pose additional medical dangers.

89.     Ms. Williams's treatment decisions, and lack thereof, were a substantial departure and abandonment of accepted professional judgment, practice, and standards.

90.     To this day, Mr. Stallings still has not received the medical care that he needs.


WHEREFORE, Plaintiff Jasmon Stallings respectfully requests that the Court enter judgment in his favor and against Defendants on all claims in this *First Amended Complaint*, and award the following relief:

A.     A declaration that Defendants have violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Mr. Stallings by the Eighth and Fourteenth Amendments to the U.S. Constitution;

B.     With respect to Defendants sued in their official capacities, an injunction requiring treating physicians and care providers to (i) immediately arrange appropriate medical treatment for Plaintiff's health issues; (ii) immediately arrange for Plaintiff to be examined by a dermatologist and neurologist for his medical conditions; and (iii) immediately arrange for Plaintiff to receive necessary surgery and other treatment to address his medical conditions;

C.     An order requiring Defendants to pay all damages in an amount sufficient to compensate Plaintiff for all injuries suffered due to Defendants' unlawful conduct;

D.     An award of costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and other applicable authority;

E.     An award of punitive damages to sanction Defendant's unreasonable, willful, and unconstitutional conduct;

F.     An award to Plaintiff of such other relief as the Court deems proper and just.

### Count VI
### (*against Wexford Health Sources, Inc.*)

91.     Mr. Stallings repeats and realleges paragraphs 1 – 90.

92.     Wexford, as a corporation contracting with the IDOC to provide medical services to inmates, acted and continues to act under color of state law.

93.     Unfortunately, Stallings's situation is not an isolated incident at Stateville or, even in the Illinois Department of Corrections as a whole.  Though there is no supervisory

liability under § 1983, upon information and belief Wexford is liable to Mr. Stallings because the unconstitutional treatment that he received arose from Wexford's policies or informal customs.

94. Similar lawsuits filed by other inmates at Stateville have alleged that Wexford has a policy, procedure, or practice of pressuring medical care providers to deny medical care and treatment to inmates as a cost saving device. Mr. Stallings believes that further investigation and discovery on this issue will likely establish evidentiary support for such a policy, procedure or practice.

95. Upon information and belief, at all relevant times to this *First Amended Complaint*, and continuing to this day, Wexford maintains an overarching policy, procedure, or practice at Stateville to not follow the written policies of Wexford and the IDOC and of instead intentionally delaying and denying adequate medical care to inmates as a cost saving device; such policy, procedure, or practice is the direct and proximate cause, and moving force, behind the unconstitutional treatment suffered by Mr. Stallings.

96. In particular, upon information and belief, Wexford maintained a policy, procedure, or practice at Stateville: (a) to unreasonably limit the staff and resources necessary to adequately treat the serious medical conditions of inmates; (b) to routinely fail and refuse to properly examine inmates with serious medical conditions; (c) to routinely fail and refuse to respond to inmates who: (i) request medical care, medication, or ask to see a doctor; (ii) exhibit obvious signs of a serious medical condition; and/or (iii) exhibit the need for treatment by specialists or other more costly treatment. For example, the John Howard Association of Illinois ("JHA") has visited each of the IDOC facilities in order to access, among other things, the medical and healthcare programs in the facilities. The extreme lack

of medical staff was a serious and consistent issue in nearly all the facilities; JHA's visit to Stateville revealed "significant understaffing problems" in both medical and correctional staff, a problem which "has been normal at Stateville for at least four years."

97.     Upon information and belief, Wexford was aware that its practices were causing harm, and was aware that these practices permitted subordinate officers to repeatedly provide inadequate care to inmates; by failing to rectify this situation, Wexford condoned and adopted the unconstitutional conduct of its subordinate officers.

98.     In addition, Mr. Stallings informed Wexford of his medical dilemma in a letter dated July 1, 2011, a copy of which is Attached as *Exhibit M*.

99.     As a result of Wexford's unconstitutional policies, procedures and practices, Mr. Stallings was deprived of his constitutional right to receive adequate medical care, and has been forced to endure years of unnecessary and unreasonable pain and suffering.

100.    To this day, Mr. Stallings has still not received the medical care that he needs.


WHEREFORE, Plaintiff Jasmon Stallings respectfully requests that the Court enter judgment his favor and against Wexford on all claims in this *First Amended Complaint*, and award the following relief:

A.      A declaration that Wexford violated the Civil Rights Act of 1871, 42 U.S.C. § 1983, for violations of the rights, privileges and immunities guaranteed to Mr. Stallings by the Eighth and Fourteenth Amendments to the U.S. Constitution;

B.      An injunction requiring treating physicians and care providers to (i) immediately arrange appropriate medical treatment for Plaintiff's health issues; (ii) immediately arrange for Plaintiff to be examined by a dermatologist and neurologist for his

medical conditions; and (iii) immediately arrange for Plaintiff to receive necessary surgery and other treatment to address his medical conditions;

C.     An order requiring Defendants to pay all damages in an amount sufficient to compensate Plaintiff for all injuries suffered due to Defendants' unlawful conduct;

D.     An award of costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988, and other applicable authority;

E.     An award of punitive damages to sanction Defendant's unreasonable, willful, and unconstitutional conduct;

F.     An award to Plaintiff of such other relief as the Court deems proper and just.

## Count VII
### (*Breach of contract against Wexford Health Sources, Inc. and the IDOC*)

101.    Mr. Stallings repeats and realleges paragraphs 1 – 100.

102.    This Count is pendant to the previous counts and supplemental jurisdiction is conferred pursuant to 28 U.S.C. § 1367.

103.    At all times relevant to this *First Amended Complaint*, a contract existed between Wexford and the IDOC to provide health care and medical services to IDOC inmates.  Upon information and belief, a conforming copy of the contract is attached as *Exhibit N*.

104.    By the terms of the contract, Wexford was to arrange for the provision of medical services to IDOC inmates on-site and off-site as medically indicated.

105.    The contract requires that Wexford "ensure that all medical services are provided in accordance with medically accepted community standards of care."  See *Exhibit N* at § 2.3.1.

106.    At all times, Wexford was "responsible for the negligent acts and omissions of its agents, employees and subcontractors in their performance of" Wexford's duties under the contract.  See *Exhibit N* at § 4.2.5.

107.    This contract was made for the benefit of IDOC inmates, including Mr. Stallings, and as a result, Wexford had a duty to inmates generally, and Mr. Stallings in particular, to ensure that they receive appropriate and adequate medical attention and treatment while incarcerated.

108.    Wexford, by and through its contracted medical personnel, employees and agents, breached the agreement by failing to provide the appropriate attention and adequate care for the serious medical needs of Mr. Stallings.

109.    Furthermore, under Illinois law, an entity or individual providing medical care has an implied contractual obligation to use proper skill and care and to provide proper medical aid.

110.    Wexford breached that duty and its agreement in that it failed to ensure that all medical services were provided to Mr. Stallings in accordance with medically accepted community standards of care, including but not limited to Wexford's failure to ensure that its employees provided Mr. Stallings with the appropriate attention and adequate care for his serious medical needs.

111.    The IDOC, by and through its Director Salvador Godinez and his subordinates, breached this agreement by failing to provide the appropriate attention and adequate care for the serious medical needs of Mr. Stallings.

112.    As a result of these breaches, Mr. Stallings suffered and continues to suffer physical and mental pain and anguish as a result of his afflictions, including but not limited to physical deformity, infections, headaches, and fainting.

WHEREFORE, Plaintiff Jasmon Stallings respectfully requests that this Court:

A.    Order specific performance from Defendants Wexford and Godinez; and

B.    Award and grant such further relief that this Court deems just and proper

DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Mr. Stallings demands trial by jury for all of the issues pled so triable.

Respectfully submitted,

JASMON STALLINGS

By:    /s/ Richard A. Toth
His Court-appointed attorney

Richard A. Toth
Daley and George, Ltd.
20 S. Clark St., Suite 400
Chicago, IL  60603
(312) 726-8797
Fax:  (312) 726-8819