IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JASMON STALLINGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 10 C 6987 |
| LIPING ZHANG, PARTHASARATHI GHOSH, | ) | |
| IMHOTEP CARTER, RONALD SCHAEFER, | ) | |
| LATONYA WILLIAMS, and | ) | |
| WEXFORD HEALTH SOURCES, INC. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Jasmon Stallings ("Stallings") filed this suit under 42 U.S.C. § 1983 against Dr.

Liping Zhang ("Dr. Zhang"), Dr. Parthasarathi Ghosh ("Dr. Ghosh"), Dr. Imhotep Carter ("Dr.

Carter"), Dr. Ronald Schaefer ("Dr. Schaefer"), La Tanya Williams ("Williams"), Wexford

Health Sources, Inc. ("Wexford"), and the Illinois Department of Corrections ("IDOC"), seeking

compensatory and punitive damages for alleged violations of Stallings's Eighth and Fourteenth

Amendment rights. Counts I through V of Stallings's first amended complaint ("Amended

Complaint") allege that Zhang, Ghosh, Carter, Schaefer, and Williams were deliberately

indifferent to Stalling's serious medical needs. (Dkt. No. 45 ("Am. Compl.") ¶¶ 40-90.) Stallings

further alleges that Wexford's policies, procedures, and practices (1) deprived Stallings of his

right to receive adequate medical care (Count VI) and (2) breached Wexford's contract with

IDOC to provide medical services to inmates incarcerated in Illinois prisons (Count VII). (Am.

Compl. ¶¶ 91-112.) On March 3, 2012, this court granted IDOC's motion to dismiss Count VII

of Stallings's Amended Complaint. (Dkt. No. 56.) On April 23, 2012, this court granted Wexford's motion to dismiss Count VII. (Dkt. No. 76.) Wexford and the individual defendants (collectively, "Defendants") have moved for summary judgment on Counts I through VI. (Dkt. Nos. 133, 136.)[1] For the reasons explained below, Defendants' motions are granted.

## FACTUAL BACKGROUND

In 2004, Stallings was diagnosed with a keloid on the back of his head while he was incarcerated at Menard Correctional Center in Menard, Illinois. (Dkt. No. 150 ("Pl.'s SMF") ¶ 1.) A keloid is a type of permanent scar, the appearance of which depends on a person's skin type. (Dkt. No. 134 ("Defs.' SMF") ¶ 47.) Stallings's keloid initially measured roughly one-half centimeter in diameter but has grown to "a large protuberant mass not less than 2 inches by 1 inch." (Pl.'s SMF ¶ 7.)

In April 2007, Stallings was transferred to Stateville Correctional Center ("Stateville") in Crest Hill, Illinois. (Pl.'s SMF ¶ 2.) Stallings filed at least three grievances with Stateville seeking treatment for his keloid and claims to have written letters to Drs. Ghosh and Schaefer complaining about his keloid treatment. (Pl.'s SMF ¶¶ 10, 12, 14, Ex. H.) His efforts to seek additional treatment—specifically, the surgical removal of his keloid—form the basis of his claims in this lawsuit. (Pl.'s SMF ¶ 2.)

I.    Williams and Dr. Zhang

In January 2008, Stateville's barbers refused to cut Stallings's hair without a note from the medical staff stating that Stallings's scalp condition was not dangerous or contagious. (Am. Compl. ¶ 15; Dkt. No. 134 ("Defs.' SMF") Ex. A at 45:4-7.) On January 22, 2008, Stallings

---

[1]   Defendants Zhang, Ghosh, Schaefer, Williams, and Wexford filed a joint motion for summary judgment on January 1, 2014. (Dkt. No. 133.) Defendant Carter filed separately for summary judgment on January 14, 2014. (Dkt. No. 136.)

sought such a note from Stateville's medical staff. (Defs.' SMF ¶ 10, Ex. A at 45:4-7.) Williams, who was working at Stateville as a physician's assistant, determined that Stallings's scalp condition was a keloid with some "exfoliation," which means that it had small scratches and superficial abrasions. (*Id.* ¶ 11.) Williams prescribed a topical antibiotic ointment to treat the scratches and abrasions present on Stallings's keloid. (*Id.* ¶ 12; Defs.' SMF Ex. A at 46:17-20.)

On September 1, 2008, Stateville "Med Tech" Wendy Olsen-Foxen placed Stallings on "sick call" due to bleeding and pain associated with Stallings's keloid. (Defs.' SMF ¶¶ 14-15.) On September 6, 2008, Dr. Zhang, a physician on Stateville's medical staff, treated Stallings for his scalp condition. (*Id.* ¶ 16.) Dr. Zhang, like Williams, diagnosed the scalp condition as a keloid. (*Id.*) Although Stallings's keloid was not bleeding at the time of Dr. Zhang's examination, the skin area around the keloid appeared to be infected and contained bumps indicative of scratching. (*Id.* ¶¶ 16-17; Defs.' SMF Ex. B at 47:8-48:11.) Dr. Zhang prescribed Selsun lotion and a topical antibiotic to treat the infection and reduce itching. (*Id.*) Dr. Zhang explained at her deposition that scratching a keloid—which Stallings appeared to be doing—could stimulate the area and cause the keloid to grow. (Defs.' SMF Ex. B at 48:6-11.)

On October 2, 2008, Dr. Zhang again treated Stallings. (Defs.' SMF ¶ 18.) Dr. Zhang prescribed Mycolog, an anti-inflammatory cream containing a steroid, and Diflucan, an oral medication. (Defs.' SMF ¶ 19.) Dr. Zhang intended the two prescriptions to address a possible yeast infection and itching in the area around the keloid. (Defs.' SMF Ex. B at 53-54.)

On January 4, 2010, Williams treated Stallings for his scalp condition. (Defs.' SMF ¶ 20.) Stallings complained to Williams that bumps on his scalp had caused him pain for the past two weeks. (*Id.* ¶ 21.) Williams determined that Stallings's keloid was swollen and infected. (*Id.* ¶ 22.) Williams prescribed a number of concurrent treatments: Cipro, an oral antibiotic; Tylenol;

Trimeton, a steroid; Lidex, a lotion; and warm compresses.[2] (*Id.* ¶ 23.) Williams intended the prescribed regimen to treat the infection, swelling, and itching around the keloid. (*Id.*; Defs.' SMF Ex. A at 57-60.)

On January 5, 2010, Dr. Zhang examined Stallings because he also complained of throbbing headaches. (Defs.' SMF ¶ 25.) Dr. Zhang ordered a skull x-ray, a complete metabolic panel, and blood testing. (*Id.* ¶ 26.) She also prescribed Antivart for dizziness, prescribed Tylenol for pain, and requested that Stallings return to the clinic in two weeks. (*Id.* ¶ 26-27.) On February 8, 2010, Dr. Zhang met with Stallings to go over the test results and concluded that none of the tests shed light on the cause of Stallings's headaches and dizziness, which she also concluded were caused by Stallings's keloid. (*Id.* ¶ 29.)

On May 22, 2010, Dr. Zhang again treated Stallings for his keloid, which was not at the time swollen or infected. (*Id.* ¶ 31.) Stallings stated that he wanted the keloid removed and refused to continue using the prescribed shampoo because he thought it caused hair loss. (Defs.' SMF ¶¶ 31-32; Pl.'s Resp. to Defs.' SMF ¶ 32.) Dr. Zhang discussed with Stallings the risks of keloid removal, which include infection and the possibility that the keloid might regrow even larger after removal. (Defs.' SMF ¶ 33, Ex. B at 73:1-23.) Dr. Zhang further advised Stallings that removal would be purely elective and was not medically necessary. (*Id.* ¶ 34, Ex. B at 74:12-19.) In Dr. Zhang's medical opinion, Stallings's keloid was not the cause of his headaches or dizziness. (*Id.* ¶¶ 30, 35.) Wexford terminated Dr. Zhang's employment in June 2010 because of an unrelated incident. (*Id.* ¶ 37.)

---

[2] Stallings disputes Williams's prescribed regimen, stating that he "only received pills, lotion, and shampoo." (Dkt. No. 147 ("Pl.'s Resp. to Defs.' SMF") ¶ 23.) Stallings's description, however, is consistent with the treatment regimen Williams claims to have prescribed.

II.     Dr. Ghosh and Dr. Schaefer

On March 1, 2011, Dr. Schaefer, another staff physician at Stateville, treated Stallings for blood in his stool and lower abdominal pain. (Defs.' SMF ¶ 49.) The parties dispute whether Stallings complained about his keloid when Dr. Schaefer treated him for blood in his stool and lower abdominal pain. Although Dr. Schaefer did not note Stallings's keloid in the medical record of his examination on March 1, (Defs.' SMF ¶ 49), Stallings claims that Dr. Schaefer refused to examine or treat the keloid and told Stallings "you're not here for that," (Pl.'s Resp. to Defs.' SMF ¶ 49).

On March 4, 2011, Dr. Ghosh, who was the Medical Director at Stateville, treated Stallings for rectal bleeding. (*Id.* ¶¶ 38-39.) The parties similarly dispute whether Stallings complained about his keloid when Dr. Ghosh treated him for rectal bleeding. Although Dr. Ghosh did not note Stallings's keloid in the medical record of his examination on March 4, (Defs.' SMF ¶ 42), Stallings claims that Dr. Ghosh refused to examine or treat the keloid and told Stallings "you're not here for that," (Pl.'s Resp. to Defs.' SMF ¶¶ 40-42).

On March 25, 2011, Dr. Schaefer again treated Stallings for chronic bloody stools. (Defs.' SMF ¶ 50.) The parties again dispute whether Stallings complained about his keloid to Dr. Schaefer on March 25. Although Dr. Schaefer did not note Stallings's keloid in the medical record of his examination on March 25, (*id.*), Stallings claims that Dr. Schaefer refused to examine or treat the keloid and told Stallings "you're not here for that," (Pl.'s Resp. to Defs.' SMF ¶ 50).

On October 18, 2011, Dr. Schaefer performed a yearly physical examination of Stallings. (Dkt. No. 138 ("Carter SMF") ¶ 27.) Dr. Schaefer noted the existence and placement of Stallings's keloid in his record of the physical exam.

III.     Dr. Carter and Non-Party Dr. DuBrick

On December 20, 2011, Dr. DuBrick, who is not a party to this lawsuit,[3] examined Stallings in connection with his scalp condition. (Carter SMF ¶ 30.) Dr. DuBrick diagnosed Stallings's scalp condition as a fluctuant keloid and scheduled an irrigation and debridement procedure. (*Id.*) Before the procedure, Stallings signed a consent form authorizing Dr. DuBrick to perform drainage of a possible abscess on the scalp and inject a steroid into the keloid scar. (*Id.* ¶ 35.) The parties dispute whether the consent form also stated "There will be a large scar. Hair will not grow back. I am looking for infection. This is not a cosmetic or plastic surgery. Scar may get worse." (*Id.* ¶ 36.) On January 13, 2012, Dr. DuBrick commenced the procedure, made three incisions into the keloid, and noted that the keloid was dense, fibrous, and hard. (*Id.* ¶¶ 33, 37.) Dr. DuBrick attempted to inject into the keloid 2cc of Kenalog, which is a steroid, but was only able to inject 1cc because of the keloid's density. (*Id.* ¶ 38.) After the procedure, Dr. DuBrick prescribed Tylenol to treat pain and Keflex to prevent a bacterial infection. (*Id.* ¶ 41.) Dr. DuBrick also attempted to inject Stallings with tetanus toxoid, presumably to prevent tetanus, but Stallings refused the injection and signed a form confirming his refusal. (*Id.* ¶ 40.) On January 19, 2012, Dr. DuBrick prescribed Stallings with Lamisal to prevent a fungal infection around the keloid. (*Id.* ¶ 43.)

On February 19, 2012, members of the medical staff at Stateville were called to Stallings's cell in response to a reported fainting incident. (*Id.* ¶ 44.) Although Stallings was awake, alert, and oriented, the medical staff brought Stallings to the Stateville emergency room for examination. (*Id.* ¶¶ 44-45.) The medical staff called Dr. Carter, who replaced Dr. Ghosh as the Stateville Medical Director on July 25, 2011, to inform him of Stallings's fainting episode.

_____

[3]     Defendants do not provide Dr. DuBrick's first name nor his position at Stateville.

(*Id.* ¶ 47.) The medical staff informed Dr. Carter that Stallings had no visible signs of injury and that his vital signs were within normal limits. (*Id.*) The medical staff also told Dr. Carter that Stallings was not experiencing nausea, vomiting, or severe dizziness. (*Id.*) Dr. Carter claims that the medical staff did not mention Stallings's keloid. (*Id.*) Stallings, who was not a participant to the phone call, disputes that his keloid was not mentioned. (Dkt. No. 149 ("Pl.'s Resp. to Carter SMF") ¶ 47.) Dr. Carter directed the medical staff to schedule a follow-up evaluation on February 22, 2012, which is Stateville's protocol for fainting episodes. (Carter SMF ¶¶ 48, 50.)

Dr. Carter contends that Stallings failed to appear for his February 22, 2012 examination as well as several appointments to undergo laboratory blood work in April 2012. (*Id.* ¶ 51.) Stateville inmates have the right to refuse to show up for scheduled medical appointments. (*Id.* ¶ 52.) Stallings, on the other hand, contends that Dr. Carter canceled the February 22, 2012 appointment following Stallings's fainting episode. (Pl.'s Resp. to Carter SMF ¶¶ 50-52.)

IV.    Opinions Concerning Treatment of Stallings's Keloid

   A.    Medical Opinions

According to Dr. Carter, a keloid is a type of permanent scar the appearance of which depends on a person's skin type. (Defs.' SMF ¶ 47.) Keloids tend to get larger over time and often return if they are removed. (*Id.*) In Dr. Carter's medical opinion, the proper treatment for Stallings's keloid included treatments to relieve itching and irritation, such as creams lotions, and occasionally pain medication. (Carter SMF ¶ 62.) Dr. Carter does not believe that Stallings's keloid was the source of any headaches, dizziness, fainting, or seizures. (*Id.* ¶ 63.) Dr. Carter further believes that surgical excision was not the proper course of treatment for Stallings's keloid because surgical manipulation might have caused scar tissue and growth of the keloid. (*Id.* ¶ 64.) Finally, Dr. Carter believes that no treatment regimen other than the one followed by

Stateville's medical staff would have been appropriate to treat Stallings's keloid. (*Id.* ¶ 65.)

In Dr. Zhang's medical opinion, removing of Stallings's keloid in May 2010 posed medical risks and was not medically necessary. (Defs.' SMF ¶ 34.) At the time, Dr. Zhang did not believe that Stallings's keloid was the source of his alleged headaches, dizziness, and fainting. (*Id.* ¶ 35.)

### B. Wexford Guidelines

Wexford's medical guidelines for Stateville state that referral to a dermatologist is appropriate for keloids that are extremely large or symptomatic. (Dkt. No. 147-1 ("Pl.'s SMF") ¶ 13.) Defendants contend Wexford's medical guidelines do not mandate that such a referral is necessary for every keloid. (Dkt. No. 150 ("Defs.' Resp. to Pl.'s SMF") ¶ 13.) Stallings does not claim that he sought a referral to a dermatologist for his keloid.

### C. Stallings

Stallings opines that his keloid caused him to suffer pain, headaches, and loss of sleep. (Pl.'s SMF ¶¶ 5, 11.) He claims that because of his keloid he cannot lay on his back. (*Id.* ¶ 6.) Stallings's keloid became infected on multiple occasions, resulting in pus and drainage and, on at least one occasion, bleeding. (Pl.'s SMF ¶¶ 3-4.) Stallings asserts that removal of a keloid subject to infection, like his, is not a cosmetic procedure. (Pl.'s Resp. to Defs.' SMF ¶ 33.) Stallings further asserts that "virtually all medical procedures have risks, which are often outweighed by the benefits of the procedure." (*Id.*) Finally, Stallings claims that he agreed to assume the risks inherent to removing his keloid and affirmatively requested removal. (Pl.'s Resp. to Defs.' SMF ¶ 33.)

### LEGAL STANDARD

A grant of summary judgment is proper "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the court of the basis for its motion and identifying the evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). "There is no genuine issue of material fact when no reasonable jury could find in favor of the nonmoving party." *Brewer* v. *Bd. of Trs. of the Univ. of Ill.*, 479 F.3d 908, 915 (7th Cir. 2007). When ruling on a motion for summary judgment, the court must consider the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in the nonmoving party's favor. *Woodruff* v. *Mason*, 542 F.3d 545, 550 (7th Cir. 2008). The court does not make credibility determinations or weigh conflicting evidence. *McCann* v. *Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## ANALYSIS

### I.    Stallings's Deliberate Indifference Claims (Counts I through V)

Counts I through V of Stallings's Amended Complaint allege that the five individual defendants—Williams and Drs. Zhang, Ghosh, Schaefer, and Carter—were deliberately indifferent to Stallings's serious medical needs. § 1983 provides a cause of action against a person who, acting under color of state law, deprives an individual of any "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Livadas* v. *Bradshaw*, 512 U.S. 107, 132 (1994). "§ 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Graham* v. *Connor*, 490 U.S. 386, 394 (1989) (internal citations and quotations omitted). Here, deliberate indifference to the serious medical needs of a prisoner violates the Eight Amendment's prohibition against cruel and unusual punishment. *Duckworth* v. *Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008). Stallings alleges

that each defendant knew of his serious medical condition but recklessly disregarded it.

Correctional officers and health care providers may not act with deliberate indifference to an inmate's serious medical needs. *See Estelle* v. *Gamble*, 429 U.S. 97, 104 (1976); *Fields* v. *Smith*, 653 F.3d 550, 554 (7th Cir. 2011). Deliberate indifference has both an objective and a subjective component: the inmate must have an objectively serious medical condition, and the defendants must be subjectively aware of, and consciously disregard, the inmate's medical need. *See Farmer* v. *Brennan*, 511 U.S. 825, 837 (1994); *Estelle*, 429 U.S. at 103-04; *Roe* v. *Elyea*, 631 F.3d 843, 862 (7th Cir. 2011).

A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention. *See Edwards* v. *Snyder*, 4778 F.3d 827, 830-31 (7th Cir. 2007); *Foelker* v. *Outagamie County*, 394 F.3d 510, 512-13 (7th Cir. 2005). A condition is also objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain." *Hayes* v. *Snyder*, 546 F.3d 516, 522 (7th Cir. 2008). As discussed above, Stallings's keloid required treatment on a number of occasions for irritation and infection. Although the Seventh Circuit has not addressed whether a keloid can satisfy the objective component of a deliberate indifference claim, most defendants here concede that Stallings's keloid is a serious condition.[4] (*See* Dkt. No. 151 at 5 ("These defendants do not question . . . that [Stallings's] keloid condition is a 'serious medical need.'").) Accordingly, viewing the facts in the light most favorable to Stallings, the nonmoving party, the court finds that Stallings's keloid meets the objective prong of a deliberate indifference claim. *See also Brock* v. *Wright*, 315 F.3d 158, 163

---

[4]  Dr. Carter, who filed a separate motion for summary judgment, argues that Stallings's keloid is not a serious medical condition for purposes of a deliberate indifference claim. (Dkt. No. 136 at 6-7.)

(2d Cir. 2003) (holding genuine issue of material fact existed where prisoner presented evidence that his keloid scar caused chronic pain).

Under the subjective component, a prisoner must demonstrate that each defendant was aware of and consciously disregarded the prisoner's medical need. *See Farmer*, 511 U.S. at 837; *Estelle*, 429 U.S. at 103-04; *Hayes*, 546 F.3d at 522. Deliberate indifference "is merely a synonym for intentional or criminally reckless conduct." *Salazar* v. *City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991). Neither negligence nor gross negligence constitutes deliberate indifference. *Farmer*, 511 U.S. at 836. But the fact that a prisoner has received *some* treatment for his condition does not automatically defeat his claim; evidence of "blatantly inappropriate" treatment or "woefully inadequate action" may suffice. *See Greeno* v. *Daley*, 414 F.3d 645, 654 (7th Cir. 2005). The subjective component also covers erroneous treatment based on a substantial departure from accepted medical judgment, practice, or standards. *See Roe*, 631 F.3d at 857; *Vance* v. *Peters*, 97 F.3d 987, 992 (7th Cir. 1996). To be liable for deliberate indifference, however, the decision must be "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson* v. *Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (internal citations and quotation marks omitted).

Stallings's specific issue with the treatment of his keloid is difficult to decipher. In his Amended Complaint, Stallings claims that Defendants have repeatedly rejected his request for "appropriate" treatment of his keloid. (Am. Compl. ¶ 19.) As discussed above, however, Stallings received treatment on numerous occasions for irritation and infection associated with his keloid, and underwent at least one procedure involving a steroid injection. Stallings responds that all of these treatments were "for irritation and infection only, not the keloid itself." (Dkt. No.

146 ("Pl.'s Mem.") at 8.) Given Stallings's requests to have his keloid removed, and his failure to advise the court of any treatment options other than removal, the court interprets Stallings's claim to be that Defendants exhibited deliberate indifference by refusing to surgically remove Stallings's keloid. Because Defendants all adopted a course of treatment that did not include surgical removal, Stallings's claims against each individual defendant, which Stallings pled as separate counts, can be analyzed together.

In support of his argument, Stallings directs the court to two cases where a district court found that a genuine issue of material fact existed as to whether the denial of surgery to remove a keloid constituted deliberate indifference. *See Revels* v. *Meyers*, 2009 WL 3122514, *8-9 (C.D. Cal. Sept. 25, 2009); *Harris* v. *Winslow*, 2006 WL 1096011, *4 (N.D. Cal. Apr. 25, 2006). In both of Stallings's cited cases, however, there existed *some* medical opinion advising surgery as the proper course of treatment. In *Revel*, prison medical staff refused to perform removal surgery despite an outside surgeon's diagnosis that the plaintiff's keloid was "very large" and "needed to be removed." *Revel*, 2009 WL 3122514, at *6. In *Harris*, the prison medical committee twice refused to approve keloid removal surgery and only approved the surgery after a special master, who was also a doctor, became involved through a class action and "conferred" with prison officials. *Harris*, 2006 WL 1096011, at *4. Stallings cites a third case which does not involve surgery but follows the same pattern. In *Phillips* v. *Murray*, 2011 WL 4914150, *7 (N.D. Md. Oct. 14, 2011), a district court in the District of Maryland found that a genuine issue of material fact existed where prison officials denied the plaintiff steroids to treat his keloid. In *Phillips*, like *Revel* and *Harris*, the prison officials' decision directly contravened the treatment prescribed by the plaintiff's physician, which included a regular course of steroids. *Id.* at *7.

Here, Stallings has presented no medical evidence showing that surgical removal was an

appropriate course of treatment for his keloid. The only source of medical evidence before the court is the testimony of Stallings's treating physicians. Dr. Carter believes that surgical removal, at the time, was not the proper course of treatment for Stallings's keloid because surgical manipulation might have caused scar tissue and growth of the keloid. Dr. Zhang believes the same. Stallings does not dispute the doctors' diagnoses. Instead, he argues that "virtually all medical procedures have risks, which are often outweighed by the benefits of the procedure." (Pl.'s Resp. to Defs.' SMF ¶ 33.) The court specifically ignores the questionable veracity of Stallings's statement and accepts it as true. Stallings's statement, however, does not dispute the doctors' diagnoses nor does Stallings's statement purport to establish surgical removal as the proper course of treatment of his keloid. Consequently, there is no evidence on the record proving that Defendants, by not surgically removing Stallings's keloid, departed from any accepted medical judgment, practice, or standard, let alone departed so substantially "as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson* v. *Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (citations omitted). "What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by doctor[s] to treat a medical need in a particular manner." *Id.* (quoting *Snipes* v. *DeTella*, 95 F.3d 586, 591 (7th Cir. 1996)). Stallings may want to assume the risks associated with removing his keloid, but he does not have a right to choose his course of treatment. The fact that Stallings's personal cost-benefit analysis differs from that of his treating physicians does not give rise to a deliberate indifference claim.

Accordingly, because no reasonable jury could find that Defendants exhibited deliberate indifference by refusing to surgically remove Stallings's keloid, Defendants are entitled to summary judgment on Counts I through V of Stallings's Amended Complaint. Because the court

has determined that Stallings failed to present facts sufficient to support his deliberate indifference claims, the court need not consider whether Stallings exhausted his administrative remedies against Williams, Dr. Schaefer, and Dr. Carter.

II.     Wexford's Liability as to Stallings's Medical Care (Count VI)

In Count VI, Stallings alleges that Wexford's policies, procedures, and practices deprived Stallings of his right to receive adequate medical care. Because the court finds that Williams and Drs. Zhang, Ghosh, Schaefer, and Carter did not violate Stallings's Eight Amendment rights, Wexford cannot be liable for an alleged custom or policy of providing inadequate medical care to inmates. In analyzing a § 1983 claim against a private corporation, the court adopts the same principles that would be applied to claims against a municipality. *Brown* v. *Ghosh*, No. 09 C 2542, 2010 WL 3893939, *8 (N.D. Ill. Sept. 28, 2010) (Feinerman, J.), citing *Rodriguez* v. *Plymouth Ambulance Serv.*, 577 F.3d 816, 822 (7th Cir. 2009)). Accordingly, a prisoner bringing a claim against a corporate entity for a violation of his constitutional rights must show that the corporation supports a "policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Brown*, 2010 WL 3893939, at *8 (quoting *Woodward* v. *Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 927 (7th Cir. 2004) (in turn quoting *Estate of Novack ex rel.* v. *Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000)) (a corporate defendant violates an inmate's rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners"). "It is well established that there can be no municipal liability based on an official policy under *Monell* [v. *Department of Social Services*, 436 U.S. 658 (1978)], if the policy did not result in a violation of a plaintiff's constitutional rights." *Houskins* v. *Sheahan*, 549 F.3d 480, 493-94 (7th Cir. 2008) (quoting King v. East St. Louis School Dist. 189, 496 F.3d 812, 817 (7th Cir. 2007)).

As discussed above, Stallings has not presented facts to support a deprivation of any constitutional right. Stallings similarly has not presented any facts demonstrating that Wexford was deliberately indifferent due to any policy, procedure or custom. Indeed, Stallings declined to mention his claim against Wexford in responding to Defendants' motions for summary judgment. (*See* Pl.'s Mem. at 1-11.) Consequently, the court grants Wexford summary judgment on Count VI of Stallings's Amended Complaint.

CONCLUSION

For the reasons explained in this memorandum opinion, Defendants' motions for summary judgment (Dkt. Nos. 133, 136) on Counts I through VI of Stallings's Amended Complaint are granted. Even viewing the record in the light most favorable to Stallings, the court concludes that no reasonable person could find that Defendants acted with deliberate indifference to Stallings's medical needs. This court has already dismissed Count VII of Stallings's Amended Complaint. (Dkt. Nos. 56, 76.)

If Stallings wishes to appeal this final order, he may file a notice of appeal with this court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Stallings plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Stallings chooses to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. *Evans* v. *Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Stallings may also be assessed a "strike" under 28 U.S.C. § 1915(g). Stallings is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

IT IS THEREFORE ORDERED that Defendants' motions for summary judgment [133], [136] are granted. The Clerk is directed to enter judgment in favor of Defendants pursuant to Fed. R. Civ. P. 56. Civil case terminated.

ENTER:

*James F. Holderman*

JAMES F. HOLDERMAN
District Judge, United States District Court

Date: June 16, 2014